Application of The PEOPLE OF THE STATE OF NEW YORK to obtain an order directing payment of monies paid into this Court to the credit of the following proceedings: In the Matter of STEINS OLD HARLEM CASINO CO., Inc., Bankrupt No. 17766 et al.

United States District Court
S. D. New York.

Feb. 21, 1956.

Jacob K. Javits, Atty. Gen. of State of New York, for People of State of New York, Mark T. Walsh, Asst. Atty. Gen., of counsel.

Paul W. Williams, U. S. Atty. for the Southern Dist. of New York, New York City, for United States, Maurice N. Nessen, Asst. U. S. Atty., New York City, of counsel.

IRVING R. KAUFMAN, District Judge.

During the years 1916 to 1943 certain moneys were paid into the Registry of this Court during the pendency of eighty different proceedings, of which 74 were bankruptcy matters, 5 were equity receivership proceedings, and 1 was a criminal proceeding in which money was deposited to be returned to its lawful owner. In all eighty matters, the persons who were adjudicated as lawfully entitled to the deposited funds never made claim to the money, and in each case, the funds were forwarded to the United States Treasury in Washington, D. C., pursuant to 28 U.S.C. § 2042. They were there deposited to the credit of the United States with the proviso that any claimant entitled to such money could, on petition to the depositing court, notice to the United States Attorney and full proof of his right thereto, obtain an order directing payment to him.

In October, 1953, New York State, (hereinafter called the State), brought suit in the Supreme Court of the State of New York, County of New York, seeking to have the funds declared escheated to the State pursuant to Article XII of the New York Abandoned Property Law, McK.Consol.Laws, c. 1, § 1200 et seq., which provides specifically for the escheat of property paid or deposited in federal courts. Pursuant to the provisions of this Article, the State named as defendants in the case all last known and unknown owners or claimants to the funds involved, and service was effected on these claimants by publication.[1] On June 21, 1955, the Supreme Court decreed the money escheated to the State of New York by default, not one of the claimants having appeared or answered. Basing its claim of right on this decree, New York now petitions this Court for an order pursuant to 28 U.S.C. § 2042 directing the Treasurer to pay over to the State the money deposited in these eighty actions.

1. In the original proceeding before the New York State Supreme Court, William V. Connell, as Clerk of this Court, was made a party defendant. The United States Attorney appeared for him and questioned the propriety of making the Clerk a party. In April, 1955, the New York State Abandoned Property Law was amended so as to delete this requirement, and a consent order discontinuing the action against the Clerk was entered on June 7, 1955.

The United States (hereinafter called the government) has contested the granting of this petition, setting forth three reasons why New York is not entitled to the funds. (1) The New York Supreme Court had no jurisdiction to declare the funds escheated because the res is in Washington hence beyond its territorial and jurisdictional limits. (2) Dealing specifically with the unclaimed funds in the 74 bankruptcy matters, § 66 of the Bankruptcy Act, 11 U.S.C.A. § 106, sets up a method of distribution of such funds which completely and exclusively occupies the field, and either New York's Abandoned Property Law must be interpreted to exclude the escheat of such money, or it is invalid because in conflict with federal law. (3) Regardless of the source of the moneys on deposit, the particular default judgment relied upon here is void because the mode of service by publication which was utilized denied due process to known claimants and did not conform to the requirements of the New York statute itself.

■■ Taking these government contentions in order, I come first to the question of whether the presence of the fund in Washington is a bar to the state escheat proceeding. It is conceded by the government that the fact that money is in the possession of a federal court does not in itself operate as a jurisdictional bar to the State's escheat proceeding. This point was authoritatively settled in favor of the states in United States v. Klein, 1938, 303 U.S. 276, 58 S.Ct. 536, 82 L.Ed. 840, in which Pennsylvania escheat laws similar to those involved herein were attacked as unconstitutional. In that case, as here, the federal government held deposited money as a stakeholder ready to pay it over to the persons lawfully entitled to it upon proof of their ownership and order of the proper district court. The Supreme Court pointed out that the state's decree of escheat was not founded upon possession but was at most an adjudication on the title of the unknown claimants, and it held that neither the federal statute nor the nature of the suit in the district court precluded transfer or change in the interests of the unknown claimants. Although the particular fund was in Washington and beyond the state's territorial jurisdiction, and although several of the unknown claimants were non-residents, the Court refused to pass upon whether these factors would operate to invalidate the escheat proceeding, as those questions were not yet before it. However, in United States v. Klein, 3 Cir., 106 F.2d 213, certiorari denied, 1939, 308 U.S. 618, 60 S. Ct. 295, 84 L.Ed. 517 (a later case dealing with the same fund) that precise question was raised and decided adversely to the government. Carrying the Supreme Court's earlier reasoning to its logical conclusion, the Court of Appeals for the Third Circuit pointed out that since possession was unnecessary for the state's escheat proceeding, the fact that the fund was in Washington did not present any obstacle, because control over the res still rested with the district court in Pennsylvania, which court could order payment. The Third Circuit's ruling has since remained unchallenged, and in the escheat cases coming after it, only passing mention has been made of the fact that the particular fund involved was situate in Washington. See e. g. In re Vulcan & Reiter Co., D.C.S.D.N.Y. 1948, 80 F.Supp. 286; In re Raabe, Glissman & Co., D.C.S.D.N.Y.1947, 71 F.Supp. 678; In re Van Schaick, D.C.S.D.N.Y. 1946, 69 F.Supp. 764. These precedents are further supported by analysis of the Supreme Court's ruling in the first Klein case. To hold that the location of the fund in Washington is a bar to state escheat proceedings would be to reduce to nothing the states' right to escheat funds deposited in federal courts which was confirmed by that decision, since unclaimed funds are normally forwarded to the Treasury after five years, whereas most state escheat statutes require a longer waiting period before the presumption of abandonment. I thus find against the government on its first contention.

I come now to the question of whether the moneys deposited in the bankruptcy

proceedings are beyond the reach of the state because of federal pre-emption of the field. The bankruptcy funds were deposited pursuant to Sec. 66 of the Bankruptcy Act, 11 U.S.C. § 106, which provides:

"Unclaimed moneys

"a. Dividends or other moneys which remain ·unclaimed for sixty days after the final dividend has been declared and distributed shall be paid by the trustee into the court ·of bankruptcy; and at the same time the trustee shall file with the ·clerk a list of the names and post-·office addresses, as far as known, of the persons entitled thereto, showing the respective amounts payable to them.

"b. Dividends remaining un-·claimed for one year shall, under the ·direction of the court, be distributed to the creditors whose claims have been allowed but not paid in full, and after such claims have been paid in full the balance shall be paid to the bankrupt: *Provided,* That, in case unclaimed dividends belong to minors, such minors may have one year after arriving at majority to claim such dividends."

It is the government's contention that this section gives to the creditors qualifying under subdivision (b) a tontine right to claim their share, *i. e.,* a right completely unlimited in time. Since, under the New York Abandoned Property Law, claimants will have only five years after the escheat to reclaim their lawful title, the government urges that the escheat operates to cut off a federal right, and this the state cannot do. Further, it urges that Congress has occupied the bankruptcy field to the exclusion of all state laws dealing in any manner with bankruptcy rights. It argues that if escheat is allowed, and the funds are turned over to the state, any claimant will thereafter have to vindicate his

rights in a state court under state law rather than in a federal forum under federal law.

■ I can find no merit in the government's contentions. Dealing first with the government's last argument, there is no indication in the bankruptcy law that Congress intended to prevent qualifying creditors from transferring their interests in the funds; indeed, the very lack of time limitation indicates that it was contemplated that heirs at law and distributees might very well come forward to vindicate former claims, and this has been the practice.[2] Such heirs or assignees when making their claim most certainly have had to trace their chain of title through state law. There is no attempt to re-adjudicate the question of who was originally entitled to the funds, but there is a tracing of chain of title from that original federal adjudication. Similar proof under similar law is necessary to reclaim escheated funds. The governments' argument of pre-emption by federal law falls with this reasoning as clearly Congress has made no attempt to regulate the passing of title to these claims, assuming it would have the power to do so. The authorities cited by the government to sustain its pre-emption argument deal with situations where the state sought to adjudicate and regulate bankruptcy rights and they are, therefore, inapposite here.

■ The government's chief contention regarding these bankruptcy deposits is that escheat cannot be completely analogized to voluntary transfers or change of title due to death, because it operates to cut off otherwise valid and subsisting rights, and it therefore interferes with the federal statutory scheme of disposition to qualifying creditors. While the argument that § 66 gives qualifying creditors a right lasting into perpetuity is superficially sound, it cannot withstand close examination. It has been repeatedly held that the Bankrupt-

---

**2.** The records on file in this District show that assignees of these creditors, executors of estates of creditors and judgment creditors of creditors have successfully petitioned the Court for the payment of such bankruptcy funds.

cy Act contemplates paying out all the money in these funds, and that a diligent creditor is not limited to his pro rata share, but he can be paid in full out of the fund to the destruction of the rights of other delinquent creditors. In re Searles, 2 Cir., 1948, 166 F.2d 475, 4 A.L.R.2d 1431; In re Gubelman, 2 Cir., 1935, 79 F.2d 976; In re Raabe, Glissman & Co., D.C.S.D.N.Y.1947, 71 F.Supp. 678. In all three of the above-cited cases, the diligent creditor, after filing his claim and serving the other claimants by publication, was allowed to collect all that was due him, even though this entirely dissipated the fund. Certainly, it cannot be contended that these dispositions did not operate to cut off the rights of all other claimants. The state's right of escheat is the right of an ultimate heir; it does not assert a separate claim to the fund but stands in the shoes of those so-called unknown creditors who are deemed to have abandoned their claims.[3] Barker v. Leggett, D.C. W.D.Mo.1951, 102 F.Supp. 642, appeal dismissed, 1952, 342 U.S. 900, 72 S.Ct. 295, 96 L.Ed. 674; In re Vulcan & Reiter Co., D.C.S.D.N.Y.1948, 80 F.Supp. 286. Such creditors, by diligence, can cut off the rights of other claimants, and the state, standing in their shoes, has the same right.[4] It is interesting to note in this connection that a bill was introduced in the House of Representatives in March 1954 which was aimed in part at curtailing the activities of various attorneys throughout the country who make a livelihood of searching the records of such abandoned funds, and finding and representing "diligent" creditors. The bill was never reported out of committee.

■ Assuming that no diligent creditor should appear, as is often the case, if the state is held not to have power to enter a decree of escheat, the sole alternative would be to have the unclaimed money remain deposited to the use and credit of the United States in perpetuity, and this alternative presents serious constitutional questions. It is a basic property rule that title must rest somewhere, and it is a logical presumption that property unclaimed over a large number of years has been abandoned by its owners; indeed, it is on the logic of this presumption that state escheat laws are based and have been upheld as constitutional. This rule and presumption would combine eventually to give the United States a de facto title to the deposited funds similar to the de jure title acquired by the states in escheat proceedings. Such a result would be contrary to the government's own admission that it is not entitled to receive these funds via escheat and to the Supreme Court's ruling to that effect in United States v. Klein, supra.

One final point worth mentioning is that this is not the first time a state has sought a Court order directing the withdrawal of such bankruptcy funds pursuant to its rights under judgment of escheat;[5] this is, however, the first time

3. Although the courts loosely label as "unknown" those creditors who have either never initially claimed their pro rata share in the fund, or who have not asserted their rights to the unclaimed balance under Sec. 66, subd. b, it should be borne in mind that these creditors are not actually completely unknown. For the most part, their last known names and addresses are filed by the trustee in bankruptcy when he deposits the unclaimed funds with the court. Because of death, dissolution, assignment, etc. however, those creditors so listed may no longer have title to the rights granted under the bankruptcy law, and it is in this sense only that they can be labelled "unknown".

4. Actually, non-appearing claimants are in a better position when a state receives these funds on the basis of its escheat decree than when other diligent creditors take all, as they have five years within which to come forward and refute the presumption of abandonment. Presumably, the state would then follow the federal rule that the claiming creditor gets paid in full.

5. The same bill, mentioned supra, which dealt with attorneys who search out "diligent" creditors, also had as its purpose prohibiting the various states from

the United States has contested such a withdrawal in this District. Granted that courts often overlook points not raised before them, but the cold fact is that federal judges have been granting such applications without indicating doubt as to the states' jurisdiction to proceed in escheat.

Recently, this practice was attacked in the Western District of Pennsylvania, and the court there upheld Pennsylvania's right to declare such bankruptcy funds escheated, pointing out that there is no conflict between the Bankruptcy Act and the escheat laws, and distinguishing those cases where a dispute existed between the bankrupts or their creditors and the state. In re Moneys Deposited In and Now Under Control of the United States District Court for the Western District of Pennsylvania, D.C. W.D.Pa.1955, 135 F.Supp. 55. I find that decision to be sound. See also In re Escheat of Funds Under Control of Federal District Court, 1941, 42 Pa.Dist. & Co. 418.

The government contends that In re Thompson's Estate, 3 Cir., 1951, 192 F. 2d 451 stands for the proposition that the state as escheator has no standing to receive these unclaimed bankruptcy funds. I do not agree, however, that Thompson's Estate stands for that proposition. There, actual claimants to the fund had come forward, and the state, asserting that it had succeeded to the rights of the other unknown claimants, requested that it receive the pro rata share of this latter group. The Court refused this request, saying that the state could not utilize escheat to deprive the petitioning creditors of their rights. The presumption on which the escheat decree rested, i. e. that the funds had been abandoned by all claimants thereto, was thus refuted by the actual claims made by qualifying creditors. At best, the state stood in the shoes of dilatory creditors whose rights were subject to

defeat by the diligent. Other decisions denying such funds to a state escheator have been based on similar grounds. E. g. Corn Exchange Bank Trust Co. v. Empire Trust Co., 2 Cir., 1953, 206 F.2d 30; In re Van Schaick, D.C.S.D.N.Y.1946, 69 F.Supp. 764. While such rulings have no bearing on the problem involving the government's claim that the Bankruptcy Act, § 66, prevents states from acquiring title to unclaimed funds via escheat, they do focus attention on the problems raised by the government's third argument against granting the State's application here, i. e. its contention that proper notice was not given to the last known and unknown claimants of the funds in question.

■■ Clearly any creditor qualifying under § 66, subd. b can defeat the state's rights in the fund by making claim thereto in opposition to the state's claim in the federal suit, or by appearing as a claimant in the state escheat proceeding itself. The decree of escheat actually operates to cut off such rights, even though technically the state does not cut off but succeeds to the title by abandonment. This is true of the non-bankruptcy deposits as well as those funds deposited pursuant to § 66. Since these unknown claimants may theoretically be relying on their right to come in and assert their claim at any time without limitation, any escheat decree obtained without reasonable warning to these creditors that they may no longer so rely will actually operate to divest rather than succeed to a federally created right, and it will thus be invalid under the supremacy clause. Further, regardless of the origin of these rights, such a decree would be subject to attack as a denial of due process of law which requires that parties be given notice and an opportunity to be heard before a decree is entered against them.

What constitutes reasonable notice will depend on the circumstances of each case, and the Supreme Court has often held

escheating funds in the custody of United States District Courts. That such applications are commonplace is shown by the government's admission on oral argument that six similar applications have been granted without contest in this district alone.

that service by publication is sufficient in escheat proceedings where claimants are unknown. E. g. Standard Oil Co. v. State of New Jersey, 1951, 341 U.S. 428, 71 S.Ct. 822, 95 L.Ed. 1078; Security Savings Bank v. People of State of California, 1923, 263 U.S. 282, 44 S.Ct. 108, 68 L.Ed. 301. However, where known claimants are involved, the Court has been adamant in requiring actual notice. City of New York v. New York, New Haven & Hartford Railroad Co., 1953, 344 U.S. 293, 73 S.Ct. 299, 97 L.Ed. 333; Mullane v. Central Hanover Bank & Trust Co., 1950, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865. In the latter case, the Court pointed out at page 315 of 339 U. S., (at page 658 of 70 S.Ct.) that publication was a far from reliable means of informing interested parties that their rights were before the courts, and said, "Chance alone brings to the attention of even a local resident an advertisement in small type inserted in the back pages of a newspaper, and if he makes his home outside the area of the newspaper's normal circulation the odds that the information will never reach him are large indeed." In weighing the question of when notice by publication is sufficient, the Court laid down this guide:

"[W]hen notice is a person's due, process which is a mere gesture is not due process. *The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it.* The reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected, . . . or, *where conditions do not reasonably permit such notice, that the form chosen is not substantially less likely to bring home notice than other of the feasible and customary substitutes.*" (Italics supplied.) Id., 339 U.S. at page 315, 70 S.Ct. at page 657.

In the instant case, the New York Supreme Court ordered service on the last known and unknown claimants by publication once each week for six successive weeks in the New York Law Journal, a lawyers' daily, and Il Progresso Italo-Americano, an Italian language daily newspaper. The advertisements contained the names of the various proceedings in which the funds had been deposited, but in only two out of these eighty funds were the names of last known claimants also listed. No actual notice was sent to any of the claimants whose rights were involved, although the last known names and addresses of most of the claimants in all the proceedings were on file in this Court and were available to state officials.

The State contends that this was in conformity with Sec. 1206 of the New York Abandoned Property Law which provides for notice by publication "not less than once in each of six successive weeks in two newspapers in the English language designated in the order as most likely to give notice to such owners or claimants." The State contends that the content of these advertisements conformed to Sec. 1204 of that same law which provides that if a fund does not exceed $500, or if the claimants to it exceed ten in number, then the names of said claimants need not be listed in the notice. The State further contends that conformity to a state statute automatically fulfills the constitutional requirement of due process. I find its contentions to be unsound.

Certainly the statute was not followed. It can hardly be said that publication in an Italian language newspaper meets the requirement of being that which is most likely to give notice to owners or claimants whose rights are being adjudicated—unless there is some special reason for believing that the claimants to a particular fund would be more likely to read an Italian paper as opposed to one published in the English language.[6] If such publication were held

6. Moreover, comparison of the language of the publication sections of the various

articles of the Abandoned Property Law makes it quite clear that the words

to satisfy statutory requirements, then I believe the statute itself would be inadequate under the constitution. There is no basis to the State's flat contention that conformity to a state statute is conformity to due process. It is well established that what constitutes due process of law is a federal question, ultimately to be determined by federal law in federal courts, and this is especially true where, as here, the particular state statute whose provisions are in question is one which affects federally adjudicated rights.

 Since undoubtedly the State will seek another escheat decree, I must determine whether publication of the type of advertisement utilized here would meet the requirements of due process if placed in a newspaper of general circulation. To assume that such an order of service by publication only, based on no investigation by the New York court as to its adequacy in the particular case, is conformity with the New York law, would be to cast serious doubts on the constitutional validity of that statute. It is doubtful, however, if Sections 1204 and 1206 of the New York Abandoned Property Law are intended as the maximum amount of notice to be given in any case involving escheat of funds deposited in federal courts. The more reasonable interpretation, and the one in conformity with the general rule of construing statutes to uphold them, would be that these provisions represent the minimum notice to be given in a situation where actual notice is found to be completely unfeasible. Where, as here, there are lists of last known claimants on file, and where the total fund involved is sufficiently substantial to be able to reasonably afford mailing notice to locatable claimants or at least listing the names of last known claimants in the published advertisements, an order directing the type of notice as was given here, even if placed in a proper newspaper, would not be valid unless based on an investigation which led the court so ordering to conclude that no other type of notice would be reasonable, despite surface indications to the contrary. This is especially true where, as here, the claimants who are presumed to be abandoning their rights may be relying on the lack of statutory limitation against presenting their claims, and the cases where claimants have appeared many years after the funds were deposited indicate that some claimants do so rely. See In re Bishop, D.C.D.N.J.1947, 72 F.Supp. 199. Where they may be located without undue expense, such claimants should be notified that their claims are being presumed abandoned. Ordinarily, a state court's conclusion as to what constitutes reasonable notice under the circumstances of a particular case will then be entitled to great weight when the decree is relied on in a federal court, but the state must make such a determination in the first instance.[7]

"English language" describe the type of newspaper generally, and not the language of the ad itself as contended by the State.

7. It is true that notice by publication has often been employed in escheat proceedings, and in suits involving petitions filed by qualifying creditors, but those decisions make no mention of this question having been raised. The practice of withholding comment upon such publication procedures where the issue is not specifically raised was recently attacked in this Circuit by Judge Frank in his dissenting opinion in In re Searles, 2 Cir., 1948, 166 F.2d 475, 477, 4 A.L.R. 2d 1431. Even those judges who do not agree with Judge Frank would find themselves bound to fully consider the question of adequate notice when the issue was placed before them particularly where, as here, the state's escheat decree operates actually, although not technically, to cut off federally created and protected rights.

There is no contention here as to the propriety of permitting the United States Attorney to raise the issue of notice to the unknown claimants. Nevertheless it should be noted that 28 U.S.C. § 2042 requires that the United States Attorney be notified when application is made for withdrawal of funds deposited in federal courts. In United States v. Cochrane, 5 Cir., 1936, 87 F.2d 3 this provision was interpreted as evincing a Con-

My conclusions as to the three major questions presented in this case can lead to but one decision. The application of the State of New York for an order directing payment to it of the funds deposited in these eighty proceedings is denied, without prejudice to its right to renew its application at such time as it obtains a decree of escheat in conformity with the constitutional requirements of notice. So ordered.

gressional intention that the United States Attorney should represent the rightful beneficiaries of the deposited funds. This interpretation accords with consistent judicial language likening the position of the stakeholding United States to that of a statutory trustee holding the fund for the benefit of its lawful owners, and I find that the United States may properly raise the question of notice here on behalf of the unknown claimants to the fund.